IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

Case No. 2:09-CR-0297
JUDGE EDMUND A. SARGUS, JR.

ARISTOTLE R. MATSA, et al.,

    Defendants.

## OPINION & ORDER

This matter is before the Court on Defendants Aristotle R. Matsa and Loula Z. Matsa's Motion to Suppress Evidence and Request for a Hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) (Doc. 160). Defendants move to suppress any and all evidence seized from 728 North High Street in Columbus, Ohio and from 462 Park Overlook Drive in Worthington, Ohio pursuant to search warrants executed on January 11, 2007. This Court held a hearing on the Defendants' motion on February 13, 2012. For the reasons that follow, the Defendants' motion is **DENIED**.

### I. BACKGROUND

Defendants Aristotle R. Matsa ("Rick Matsa") and Loula Z. Matsa ("Loula Matsa") were indicted on June 23, 2010. The 22-count Superseding Indictment describes several tax fraud schemes, conspiracies, and conduct intending to obstruct the criminal investigation. The investigation leading to the indictment included two search warrants signed by the Magistrate Judge on January 10, 2007, which are the subject of the Defendants' motion. The search warrant

applications were supported by two affidavits[1] of Special Agent David J. Gosiewski ("SA Gosiewski") of the Internal Revenue Service, Criminal Investigation Division ("IRS-CID"), "based on evidence demonstrating that [Rick Matsa], a licensed attorney, real estate broker, architect and minister in the State of Ohio, had created a complex web of shell corporations, churches, and limited liability corporations, as well as trusts with a foreign beneficiary, in order to funnel and receive the majority of his earnings tax-free, while also engaging in conduct intending to obstruct the criminal investigation." (Gov't Resp. 6.) The search warrant applications sought the authorized search of Rick Matsa's personal residence located at 462 Park Overlook Drive in Worthington, Ohio and the business offices of the Law Offices of George Z. Pappas f/k/a the Law Offices of Aristotle R. Matsa, LPA and other entities located at 726 ½ & 728 North High Street in Columbus, Ohio.

On January 11, 2007, special agents from IRS-CID executed the search warrants on Rick Matsa's personal residence and business locations. During the execution of the search warrants, IRS-CID agents seized approximately sixty boxes of documents and other material supporting tax and non-tax related offenses against Rick Matsa and others. IRS-CID agents also seized images of various computers and other media records.

Defendants now move to suppress any and all evidence seized during the searches based upon the principles established in *Franks v. Delaware*, 438 U.S. 154 (1978), contending that material information was not provided to the Magistrate Judge or that what was presented was false. Defendants further contend that a redacted version of the affidavit without the disputed

---

[1] For ease of reference, references and citations to the search warrant affidavit hereinafter shall be to "affidavit" or "Exhibit A," as both affidavits contain substantially the same information, with the exception of the description of the properties to be searched. (*See, e.g.*, Exhibit A, Section II.)

2

parts demonstrate that the Magistrate Judge could not have found probable cause for the search warrants had the Magistrate Judge been aware of the material omissions and false assertions.

## II. DISCUSSION

The Fourth Amendment provides, "[n]o warrant shall issue but upon probable cause, supported by oath or affirmation . . . ." U.S. Const. amend. IV. Probable cause is a fluid concept that is defined as being "reasonable grounds for belief, supported by less than prima facie proof, but more than mere suspicion" and exists "when there is a 'fair probability' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Lattner*, 385 F.3d 947, 951 (6th Cir. 2004), *cert. denied*, 543 U.S. 1095 (2005) (citing *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)).

In *Illinois v. Gates*, the Supreme Court set forth the basic standard for assessing whether an affidavit establishes probable cause to issue a search warrant:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

462 U.S. 213, 238–39 (1983) (internal quotations and citations omitted); *see also United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003). The issuing magistrate need only have had a substantial basis for concluding that probable cause existed. *Gates*, 275 F.3d at 238–39. Moreover, a finding of "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* at 243–44 n.13.

3

A Magistrate Judge's probable cause determination "should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236. However, that deference is not absolute, and reviewing courts must ensure that the issuing magistrate did "not serve merely as a rubber stamp for the police." *United States v. Leon*, 468 U.S. 897, 914 (1984). Further, reviewing courts "will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.'" *Leon*, 468 U.S. at 915 (quoting *Gates*, 462 U.S. at 239).

In assessing the issuing Magistrate Judge's probable cause determination, the reviewing court is concerned only with those facts which appear within the four corners of the affidavit. *United States v. Weaver*, 99 F.3d 1372 (6th Cir. 1998) (citing *Whitely v. Warden*, 401 U.S. 560, 564–65 (1971)). However, if the affidavit contains false statements that are shown to have been made knowingly and intentionally, or with reckless disregard for the truth, and if those false statements were necessary to the finding of probable cause, the evidence seized pursuant to the warrant will be suppressed. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). A *Franks* claim entails a two-part analysis: (1) whether the defendant has shown by a preponderance of the evidence that false statements were deliberately or recklessly made; and (2) "whether the affidavit, without the false statements, provides the requisite probable cause to sustain the warrant." *United States v. Charles*, 138 F.3d 257, 263 (6th Cir. 1998). A defendant is entitled to an evidentiary hearing on the veracity of the statements in the affidavit if both parts of the analysis are established.

The first element of the *Franks* inquiry asks the Court to consider whether the affidavit contains false information that was intentionally or recklessly made. Inaccurate statements that are the result of mere negligence or mistake do not fall within the framework of *Franks*. 438

4

U.S. at 171. While "false information" can include material omissions, the Sixth Circuit has "repeatedly held that there is a higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement." *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008) ("Allegations of material omission are held to a higher standard because of the 'potential for endless rounds of *Franks* hearings' due to potentially 'endless conjecture about investigative leads, fragments of information, or other matter[s] that might, if included, have rebounded to defendant's benefit.'" (quoting *United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990)). The Sixth Circuit has reiterated that "except in the *very* rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit, and that omission is critical to the finding of probable cause, *Franks* is inapplicable to the omission of disputed facts." *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) (emphasis in original). Thus, "an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997).

If a defendant succeeds in making a preliminary showing that the affidavit contained false information that was intentionally or recklessly made, the second element of the *Franks* inquiry requires the Court to consider whether the affidavit, without the false statements, provides the requisite probable cause to sustain the warrant. The Court must "determine whether, in light of the totality of the circumstances, the judge issuing the warrant had a substantial basis for concluding that a search of the specified premises would uncover evidence of wrongdoing." *United States v. Logan*, 250 F.3d 350, 364 (6th Cir. 2001).

5

Defendants set forth seven arguments in support of their motion to suppress: (1) the affiant omitted material information from the affidavit concerning the identity of confidential source number one ("CS #1"); (2) there was a lack of corroboration on the information received from CS #1; (3) the information received from CS #1 was unreliable and false; (4) the affiant omitted material information from the affidavit related to cooperating witness George Pappas; (5) the affiant omitted material information from the affidavit related to Stephanie Brooks; (6) the affidavit contains several material misrepresentations and omissions; and (7) the affidavit, without the disputed portions, does not support a finding of probable cause for the search warrants. The Court will consider each of the Defendants' arguments in turn.

### 1. Omission of Material Information Concerning Identity of CS #1

Defendants first assert that "[p]erhaps the most outrageous example of false statements and material omissions is found in the reliance of the affiant on confidential source no. 1 (CS#1)," who is Rick Matsa's ex-wife, Chrissoula Matsa. (Def.'s Mot. 3.) Defendants set forth fourteen specific material omissions that the affiant failed to provide to the Magistrate Judge which would have "dramatically impacted the Court's reliance on CS #1." (*Id.*) Most significantly, the Defendants emphasize that the affiant could not represent CS #1 as a reliable source, kept the identity of CS #1 a secret from the Magistrate Judge, and that CS #1 had "engaged in a bitter, contentious divorce which was in its final months, but not yet complete" when the affidavit was presented to the Magistrate Judge. (*Id.* at 4.) In sum, the Defendants contend that the Magistrate Judge was not provided with the "full story" concerning CS #1 and that these material omissions "exhibited a callous and reckless disregard for the truth." (*Id.* at 3.)

While the Court agrees with the Defendants that the better course for the Government would have been to be fully forthcoming with the Magistrate Judge in disclosing CS #1's identity and history with Rick Matsa, the "material omissions" that the Defendants contend the affiant failed to include were not material to the Magistrate Judge's finding of probable cause. The Government was not relying on CS #1; rather, the Government was relying on the information that CS #1 prompted the Government to find. Moreover, nowhere in the affidavit did the affiant claim that CS #1 was reliable or credible. Because the affiant did not hold CS #1 out as reliable or credible, the Magistrate Judge could not have based his decision on CS #1's reliability or credibility. *See United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990) ("The fact that the informant may have been of general bad character is really not relevant under the circumstances here where the information provided by the informant has already lead to the indictment of the defendant."). Based on all of the other evidence and testimony presented, the Court finds that this evidence, or lack thereof, is not material and therefore does not amount to reckless disregard by the affiant.

## 2. Lack of Corroboration

Defendants next assert that the affiant failed to corroborate much of the information received from CS #1. The affiant, SA Gosiewski, however, testified that he did corroborate all of the information from CS #1 in the affidavit. Specifically, SA Gosiewski testified that he corroborated the information from using information from other witnesses. SA Gosiewski further testified that by his own surveillance, as well as other investigative techniques, he was able to tie much of this information together, providing the basis for the search warrant. Further, because CS #1 was not presented as a reliable, unnamed source, specific corroboration was not

7

particularly critical to the validity of the affidavit. Rather, as further described, *infra*, the affiant used information obtained from CS #1 to uncover other probative information relative to probable cause. Therefore, the Court finds that there was sufficient corroboration of the information received by SA Gosiewski that provided probable cause for the issuance of the search warrant.

### 3. Unreliable and False Information From CS #1

Defendants also assert that much of the information provided by CS #1 was "false, fabricated, or stolen material . . . used in the Government's affidavit to obtain a search warrant. The affiant should have known that [CS #1] was unreliable." (Def.'s Mot. 15.) Defendants set forth specific statements made by CS #1 and then provide arguments as to why each statement is false or fabricated.

The Government addresses each of the alleged misstatements by CS #1 and maintains that they are not false. The Government further maintains that regardless of the alleged inconsistencies, they are not material and do not affect the validity of the search warrants.

SA Gosiewski testified that many of CS #1's claims were generally investigated and found to be reliable. Moreover, many of the alleged misstatements did not come from CS #1 directly, but rather, were the direct result of the SA Gosiewski's surveillance and other identified sources. Specifically, with respect to the claim that Matsa only has a legal assistant working in the office, several tenants told the affiant that the only person they had ever seen in the office were Rick Matsa and perhaps one other person. *See* Ex. A, Section V, ¶¶ 10–12. During SA Gosiweski's surveillance, Rick Matsa always appeared at the office alone or with only one other person. *See* Ex. A, Section V, ¶¶ 19–30. At the very least, SA Gosiewski had reason to believe

8

CS #1's statements regarding the number of workers in Rick Matsa's office. With respect to the claim that the affidavit falsely claims Rick Matsa is the only signatory on the bank accounts, Defendants proffer various checks signed by other persons as proof of the falsity. However, simply showing checks signed by persons other than the signatory on the bank account does not render those persons signatories on the account. Furthermore, even if other signatories were on Matsa's bank accounts, that fact would not undermine the probable cause finding. The other alleged falsities—i.e., the number of laptops and the networking inside Mr. Matsa's personal residence, the recording of the sale of property at 726-728 North High Street, the truck's disappearance, Metro Universal's truck purchase, and the address to which the AT&T telephone bill is mailed to—were not material. If anything, the statements were hardly inconsistent. They do not affect the validity of the search warrant.

Defendants also accuse the affiant of relying on material that he knew was stolen by CS #1. Specifically, Defendants contend that the affiant should not have believed CS #1's claim that Dr. Spigos paid Rick Matsa for his legal services because the checks provided to the Government by CS #1 "were taken from the law offices by CS #1 without authority to do so." (Def.'s Mot. 15.) The Government responds, "[t]o this day, the government is unaware of exactly how Mr. Matsa's ex-wife came into possession of the documents she provided." (Gov't Resp. 28.) While it is possible that CS #1 could have stolen the checks, it would not have been unreasonable for the affiant to believe that the nature of CS #1's personal relationship with Rick Matsa would give her ready access to any documents Rick Matsa brought home, or his place of business. It would not have been unreasonable to believe that the legal disputes between CS #1 and Rick Matsa allowed her, through civil discovery, to gain access to documents and information.

9

Regardless of the alleged inconsistent statements, they do not suggest that the affiant misrepresented facts to the Magistrate Judge, or acted with reckless disregard in his approach to the facts. Since the affiant was not deceptive and made no misrepresentation in the search warrant affidavit, there is a presumption of validity that is attached to the affidavit requesting the warrants. *Franks*, 438 U.S. at 171. Based on the affidavit in support of the search warrants and the testimony presented during the hearing, the Court finds that the affiant, SA Gosiewski, was thorough in providing a detailed description of the ongoing investigation, as well as detailed attachments for the Magistrate Judge to consider in support of the search warrant applications.

### 4. Omission of Material Information Related to George Pappas

Defendants next assert that the affiant omitted material information related to cooperating witness George Pappas ("Pappas") that would have been useful to the Magistrate Judge's determination of Pappas's reliability. The Defendants' primary argument is that the affiant should have made the Magistrate Judge aware of statements made by Pappas that he later acknowledged as lies in conjunction with his guilty plea.

The Court finds this argument lacks merit. In actuality, the affiant did advise the Magistrate Judge that Pappas had lied to the grand jury. In Section V, ¶ 14a of the affidavit, the affiant states, "Pappas told the affiant that his grand jury testimony was false, and that he is not nor was ever the sole shareholder of the LAW OFFICES OF ARISTOTLE R. MATSA . . . ." Ex. A, Section V, ¶ 14a. Defendants cannot rely on a cooperating witness's prior statements in order to establish a false statement deliberately or recklessly made under *Franks*, particularly when Pappas's alleged lies to criminal investigators and the grand jury comprised the conspiracy charge against Rick Matsa and Loula Matsa in the Superseding Indictment. Based on all of the

10

other evidence and testimony presented, the Court finds that this evidence, or lack thereof, is not material and does not amount to deliberate falsehood or reckless disregard by the affiant.

## 5. Omission of Material Information Related to Stephanie Brooks

Defendants also assert that the affiant omitted material information related to Rick Matsa's former wife, Stephanie Brooks's ("Brooks") recollection of a 1985 transfer of property between Rick Matsa and Loula Matsa. Specifically, Defendants contend that the affiant included information regarding the transfer of property between Rick Matsa and Loula Matsa, but failed to provide the Magistrate Judge with the relevant documents pertaining to the transfer. Brooks told the affiant that she did not know she ever owned the real property and did not sign a document transferring any interest in the property. Ex. A, Section V, ¶ 9. The affiant was not required to produce a document that Brooks stated she did not sign. In conjunction with all of the other evidence and testimony presented, the Court does not find that such alleged lack of evidence is material, nor does it amount to deliberate falsehood or reckless disregard by the affiant.

## 6. Misrepresentations and Omissions of Material Information

Finally, the Defendants list sixteen "examples of omissions, incorrect statements, and hyperbole" reflected in the affidavit. (Def.'s Mot. 19–23.) Most of the alleged misstatements pointed out by the Defendants would not have been material to the Magistrate Judge's probable cause finding. These include the affiant's qualifications, the address of the law office, Rick Matsa's various entities' purposes and addresses, Rick Matsa's age, the omission of Zacharoula Matsa's grand jury testimony, whether Stephen O'Neal is a client or friend, the location of the post office, mistakes regarding Rick Matsa's various entities' names, Mr. Pappas being

11

registered on a phone number of Rick Matsa's, Rick Matsa's status as a licensed minister, Marie Charvat's opinion of CS #1, Mr. Pappas's document production, the address of interviewed tenants, credit card applications, and Marie Charvat's denial regarding claims made in her affidavit. (*See* Def.'s Mot. 19–23, ¶¶ 1–2, 4–5, 7–16.) Inaccurate statements that are the result of mere negligence or mistake do not fall within the framework of *Franks*. 438 U.S. at 171.

Two alleged misstatements pointed out by the Defendants merit discussion. First, the Defendants contend that the affiant falsely claimed that Rick Matsa has been living beyond his reported means and has never claimed any income from his law practice, real estate practice, or architectural practice on his personal income tax returns in the years under investigation. (Def.'s Mot. 20, ¶ 3.) Defendants point to the charts in the "Filing History" section of the affidavit as proof that this statement is false. *See* Ex. A, Section V, ¶ 2. However, nowhere in the charts does it note that Rick Matsa reported income from these businesses. The other charts deal solely with either corporate or trust return filings. *See* Ex. A, Section V, ¶¶ 2–7. Moreover, as for the affiant failing to support the claim that Rick Matsa has been living beyond his reported means, the affiant's statements that Rick Matsa has never reported more than $20,954 of income in over fifteen years of tax returns but owns multiple properties, purchased an expensive vehicle, stored large amounts of cash, and owned and/or used a multitude of computers and electronic equipment, sufficiently support the affiant's claim.

Second, the Defendants contend that the affiant falsely mischaracterized Rick Matsa's taxable income when the affiant stated that Mr. Matsa "only had six years of positive taxable income since at least 1986; with $13,973 in 1993 being the highest amount of taxable income reported by Matsa." (Def.'s Mot. 21, ¶ 6.) In support of this alleged falsity, Defendants point to the affiant's graph which indicates that the total income reported in 2001 was $20,954; $13,130

12

in 2002; and $9,004 in 2003. *See* Ex. A, Section V, ¶ 2. However, this is an inaccurate reading of the affidavit. The affiant stated that the highest amount of income reported by Matsa was $13,973 in 1983 in discussing the tax returns "*obtained from Merelli,*" Rick Matsa's former account. *Id.* (emphasis added). The tax returns beginning in 2001, which reported more than $13,973, were not prepared by Merelli.

Based on all of the other evidence and testimony presented, the Court finds that this evidence, or lack thereof, is not material and does not amount to deliberate falsehood or reckless disregard by the affiant.

## 7. Probable Cause

Even if the Court were to find that the challenged statements in the affidavit were both false and deliberately or recklessly made, the Defendants would still falter under the second element of the *Franks* inquiry: if all of the misstatements were excised from the affidavit and the alleged "omissions" were added, the remaining portions of the affidavit nevertheless provide a substantial basis for a finding of probable cause.

The affidavit describes information that cooperating witness Pappas provided during interviews with the affiant and the Government's trial attorneys:

> Pappas told the affiant that his grand jury testimony was false, and that he is not nor was ever the sole shareholder of the LAW OFFICES OF ARISTOTLE R. MATSA LPA until the name was changed in April of 2004 to the LAW OFFICES OF GEORGE Z. PAPPAS, LPA during Matsa's divorce proceedings. Matsa told Pappas to tell the grand jury that client names were privileged and that the related financial documents were also privileged.

Ex. A, Section V, ¶ 14a. Pappas was told by Rick Matsa to lie to the grand jury. This alone provides a substantial basis for finding probable cause. In addition:

13

> Pappas told the affiant that a February 2004 letter sent to the attorneys for Matsa's wife during the divorce case stating that Pappas is, and has always been, the sole shareholder of THE LAW OFFICES OF ARISTOTLE R. MATSA, LPA, was not written by Pappas and that the signature was not his; Pappas had never seen the letter before the December 11, 2006 meeting and assumes Matsa wrote and sent the letter using his name. Pappas told the affiant that the letter is a bold-face lie.

Ex. A, Section V, ¶ 14c. Furthermore:

> Pappas also told the affiant that the February 2004 affidavit he signed and filed with the Franklin County Court of Common Pleas during Rick Matsa's divorce proceedings, which indicated that Pappas is, and always has been, the sole shareholder of THE LAW OFFICES OF ARISTOLTE R. MATSA, LPA, is a lie. Pappas told the affiant that the affidavit was written by Matsa and that Matsa had asked Pappas to sign the affidavit at 728 North High Street, because Matsa's wife was trying to take half of Matsa's law firm and properties. Pappas told Matsa the affidavit was not true but signed it anyway because of his loyalty to Matsa . . . .

Ex. A, Section V, ¶ 14d. Pappas also told the affiant that Rick Matsa would put Pappas's name on client correspondence and court documents that Rick Matsa had prepared for his clients, and that Rick Matsa's name appeared on very little client correspondence or court documents. *See* Ex. A, Section V, ¶ 14e. Pappas also told the affiant that Rick Matsa would have Pappas "sign a lot of blank checks as well as blank certificates of service sent out during Matsa's divorce case." Ex. A, Section V, ¶ 14i.

The affidavit also contains information that the property located at 726-728 North High Street is owned by Loula Matsa and has been since 1985, according to Franklin County Auditor records. Ex. A, Section V, ¶ 9. Prior to 1985, records reveal that Rick Matsa was the owner. *Id.* According to tax returns obtained from the IRS, however, Rick Matsa filed a Schedule E (Supplemental Income/Loss from Rental Property) for rental units located at 726-728 North High Street, from at least 1998-2001, when he filed a Schedule D sale of the property on his 2001 tax

return. *Id.* According to Franklin County Auditor records, however, the property never changed ownership. *Id.* "This claimed sale by Matsa on his 2001 Schedule D was not recorded with the county auditor, nor could it have been, because the auditor's records show the property is and has been owned by Matsa's mother since 1985." *Id.* Furthermore, the affidavit provides that the records documenting the transfer from Rick Matsa to Loula Matsa in 1985 contain the signatures of Rick Matsa and his former wife, Stephanie Brooks. When interviewed by the affiant, "Brooks told the affiant that she did not even know she owned the property, let alone transferred it to Matsa's mother." *Id.*

The affidavit also contains information that the 2000 Ford Expedition Rick Matsa drives is registered to Metro Universal Life Church ("MULC"). *See* Ex. A, Section V, ¶ 18. The affiant has observed that Rick Matsa is the only person that has been driving the vehicle and that the car has been parked at both Rick Matsa's personal residence and business locations. *Id.* In an earlier sworn deposition obtained through divorce records, Rick Matsa stated that "the trustees of the church let him use the vehicle," yet when asked who the trustees were, Rick Matsa did not know their names. *Id.* According to Secretary of State records, the only address listed for MULC is 728 North High Street. According to Ohio Department of Motor Vehicles records, the registered address for the license plate is the address of Rick Matsa's farm house, while the registered address for the title is the address of Rick Matsa's business. *Id.* According to Hocking County property records, Rick Matsa's farm house is in the name of The Spectrum Companies, Inc. as trustee. *Id.*

The affidavit also contains information that the personal residence of Rick Matsa, located at 462 Park Overlook Drive, is owned by Zacharoula LLC. Ex. A, Section V, ¶ 17. Bank records reveal that the house was purchased with two cashier's checks for the entire purchase

15

price, with one check using funds from an account in the name of "Spectrum Trust or Rick Matsa" and another check using funds from multiple bank accounts in the names of OFM Electro Trust, Research Magna Trust, Rick Matsa's personal bank account, Trans Oceanic Trust, and Zorin Trust. *Id.* The affidavit further provides that Rick Matsa opened all of these bank accounts and that Rick Matsa is the person that has control over each of these accounts and trust entities. *Id.* The affidavit includes information that Rick Matsa has opened and controlled or controls over 100 bank accounts at several banking institutions. Ex. A, Section V, ¶ 41.

The affidavit also includes the details of approximately six months of surveillance by the affiant and two trash pulls at Rick Matsa's personal residence, revealing evidence which supports the affiant's belief that Rick Matsa controls the properties for which the search warrants were sought.

All of this information supports the affiant's belief that Rick Matsa "has created a complex web of shell corporations, churches, and limited liability corporations, as well as trusts with a foreign beneficiary to funnel his money through in order to receive the majority of his earnings tax free," and that he "uses friends, family, and clients to divert ownership of various assets to make it appear that he has very little in the way of assets." Ex. A, Section IV, ¶ 1.

### III. CONCLUSION

Based on the totality of the circumstances, the Magistrate Judge had a substantial basis to conclude that there was a fair probability that evidence would be found in Rick Matsa's personal residence and business locations. The affidavit in support of the search warrants contained adequate detail regarding the suspected activity of the Defendants and the items expected to be found at Rick Matsa's home and office, which is sufficient to support the Magistrate Judge's

finding of probable cause to issue the search warrants. Further, the Defendants have failed to show that specific portions of the affiant's statements are deliberately or recklessly false.

In light of the discussion above, the Court finds there was sufficient probable cause for the issuance of both of the search warrants on Rick Matsa's personal residence and business locations. Accordingly, the Defendants' Motion to Suppress (Doc. 160) is **DENIED**.

**IT IS SO ORDERED.**

<u>    3-1- 2012    </u>
**DATED**

<u>                              </u>
EDMUND A. SARGUS, JR.
**UNITED STATES DISTRICT JUDGE**